## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MELINDA SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:15CV1684 RLW |
| | ) |
| NANCY BERRYHILL, [1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final

decision denying Plaintiff's applications for Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act. For the reasons set forth below, the Court affirms the decision of the

Commissioner.

### I. Procedural History

On March 9, 2011, Plaintiff filed an application for DIB, alleging disability beginning

March 15, 2010 due to bipolar and tendonitis in hands and arms. (Tr. 184, 281-289) The

application was denied, and Plaintiff filed a request for a hearing before an Administrative Law

Judge ("ALJ"). (Tr. 152, 184-88, 192) On September 13, 2012, Plaintiff testified before an

ALJ. (Tr. 53-102) On October 11, 2012, the ALJ determined that Plaintiff had not been under a

disability from March 15, 2010, through the date of the decision. (Tr. 157-71) Plaintiff then

filed a request for review, and on November 13, 2013, the Appeals Council granted Plaintiff's

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further actions needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

request for review and remanded the case to the ALJ for additional proceedings. (Tr. 177-78)

On February 10, 2014, the ALJ held a supplemental hearing, and on April 17, 2014, the ALJ

found that Plaintiff was not disabled. (Tr. 29-47, 103-45) The Appeals Council denied

Plaintiff's request for review on September 22, 2015. (Tr. 1-4) Thus, the decision of the ALJ

stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the second hearing before the ALJ, held on February 10, 2014, Plaintiff was

represented by counsel. She testified that she had a GED plus additional vocational training in

home health, office machines, collections, and administrative. While unemployed, Plaintiff

looked for jobs in the areas of customer service, collections, and fast food preparation. Plaintiff

previously worked for Clean Uniform, but she was let go because there were no light duty jobs

available. Plaintiff testified that the machines broke her down and caused issues in her arms and

shoulder and her whole body. Plaintiff denied ever being self-employed. She had gone through

rehab for drugs in 1991 and 1993. (Tr. 105-111)

Upon questioning from Plaintiff's attorney, Plaintiff stated she currently worked at

McDonald's as a fast food worker. She worked five hours a day, five days a week, cleaning and

taking orders. Plaintiff experienced some problems at work, including fighting with one of the

workers. She had to switch restaurants as a result. Plaintiff had worked at the current location

for 4 ½ months. Plaintiff took a cab to work. She returned to work in order to pay for

psychiatric treatment and medication. When Plaintiff was at home alone, she heard voices and

saw shadows. The voices told her to hurt herself. Plaintiff saw Dr. Partap[2] for mental health

---

[2] While Plaintiff mentions Dr. Padda as her mental health treatment provider, the record shows
that Dr. Partap treated Plaintiff for psychological issues, while Dr. Padda treated Plaintiff for
pain management.

treatment. She had been seeing Dr. Partap for two years. Plaintiff stated that she took her medication consistently but acknowledged she did not take medications for a year due to lack of funds. When Plaintiff took her medication regularly, she still had some symptoms, but the medicines suppressed her thoughts. While she saw improvement, she would become aggravated with people and go from zero to 100. She continued to have problems sleeping and recently began taking a new sleep prescription. Plaintiff testified that her energy level was normal during the day, but sometimes the medication made her sleepy. (Tr. 111-17)

Plaintiff stated that she experienced neck and back pain from either a herniated or bulging disc. Plaintiff testified that if she sat too long, she would feel pain from her neck down into her back on the right side. Her current job required Plaintiff to stand for five hours without a break. She stated, however, that she had to force herself to stand longer than three hours. Plaintiff also had spasms in her right and left shoulder, and the pain went into her back. In addition, Plaintiff experienced pain when using her arms and hands. She previously saw Dr. Padda for pain management. Plaintiff's current primary care physician ("PCP") was Dr. Ghani, and her prior PCP was Dr. Buck. Plaintiff's attorney indicated that Plaintiff would submit updated medical records. With regard to her hands and arms, Plaintiff testified that she had neuropathy which affected the bottom of her feet and her hands. The top of her hands hurt, and she had difficulty grasping and holding things. Plaintiff was unable to lift and carry anything heavy. She testified that she could lift 10 to 15 pounds. Plaintiff also had arthritis in her knees. She previously received injections. If Plaintiff stood too long, her knees would swell. Plaintiff was able to do some housework such as fixing the bed and washing a few dishes. Her husband did the vacuuming, mopping, grocery shopping, and cooking. Plaintiff stated that she was unable to

3

squeeze a mop or lift grocery bags. She went to church but did not visit with friends or family. (Tr. 117-25)

While at home, Plaintiff talked with her husband when she was not sleeping or eating. Plaintiff worked from 6:00 a.m. to 11:00 a.m. When she returned home, she went back to bed until 4:30 p.m. Plaintiff stated that she was tired, and the medicine made her sleepy. On the weekends she spent time with her husband. Plaintiff testified that she was able to get along with people at the new work location. However, she has experienced some conflicts with current employees. Plaintiff stated that she had medical insurance through her husband's work. He had been employed for over 20 years. Plaintiff was able to see a counselor through her husband's insurance. (Tr. 125-29)

A vocational expert ("VE") also testified at the hearing. Plaintiff answered questions about her past job duties. The ALJ then asked the VE to assume an individual functionally limited to light exertional work. Due to alleged mental impairments, she was limited to unskilled work that did not include more than infrequent handling of customer complaints. In addition, the person should avoid ropes, ladders, scaffolding, and hazardous heights. She could frequently do push and pull with her upper extremities. With these limitations, the individual could not perform any of Plaintiff's past relevant work. However, she could work as a marker, assembler of small products, and motel cleaner. (Tr. 129-41)

Plaintiff's attorney also questioned the VE and limited the individual to only occasionally use her right upper extremity. Further, she could not deal with the public, and interaction with co-workers would be seldom. She could not handle close supervision, and the work would need to be low stress with no aggressive production pace. The person was limited to no changes in the work routine; no more than simple, routine changes; and no decision making. In light of these

4

limitations, the VE testified that the person could still work as a marker and small products assembler. If the individual were limited to only occasional stooping and bending, and no kneeling or crawling, the marker and assembler jobs remained. Finally, if the person had to change positions and required a sit/stand option, the individual could perform the marker and assembler positions. (Tr. 141-44)

In a Function Report – Adult, Plaintiff described her daily activities as not doing much because of her aching arms and numb fingers. She would wake up; brush her teeth; bathe; make coffee; sometimes cook breakfast; and look for jobs on the internet. She took her pain medication and napped for about 2 to 3 hours. Plaintiff would try to tidy up, and then cook something to eat. She had good days and some bad days when she did not want to be a bother. Plaintiff was able prepare meals twice a week; do a little laundry and ironing; clean; and mop. She could shop for necessities such as toiletries and a little food. She enjoyed reading and watching TV. Plaintiff had problems getting along with others. She reported that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, see, remember, concentrate, understand, follow instructions, use hands, and get along with others. (Tr. 377-84)

Plaintiff's husband also completed a Function Report—Adult – Third Party. He stated that Plaintiff could cook simple meals and dust the house. She tried to help with housework but was in severe pain most days. Plaintiff became angry very easily, and she had trouble with many functional abilities due to back and shoulder pain, knee pain, and swelling of hands and feet. (Tr. 391-98)

### III. Medical Evidence

Although Plaintiff testified to physical impairments including back and shoulder pain, knee pain, and pain and swelling in her hands and feet, Plaintiff only disputes the ALJ's findings

with respect to her psychological impairments. Therefore, the Court will set forth the medical evidence regarding her mental health treatment.

Plaintiff began treatment with Mohinder Partap, M.D., at Psych Care Consultants on April 29, 2011. Her diagnosis was schizophrenia, paranoid type. (Tr. 505-07) On June 3, 2011, Plaintiff reported some relief in hallucinations and paranoia with medication. Plaintiff's husband noted improvement in Plaintiff's attitude, and Dr. Partap was pleased with her improvement. However, on July 5, 2011, Plaintiff denied improvement. Plaintiff's auditory and visual hallucinations were down by 15% on August 2, 2011, but Plaintiff reported being irritable. Dr. Partap noted Plaintiff was coherent and rational, and her medication dosages were increased. Her hallucinations were subsiding on September 6, 2011, but Plaintiff stopped taking her medications due to drowsiness. In November 2011, Plaintiff reported improved hallucinations, but she heard footsteps and saw dark shadows in her house. She was depressed and tearful. On December 27, 2011, Plaintiff stated that she heard voices telling her to cut her wrist, and she had visual hallucinations of dark shadows. Plaintiff declined hospitalization or IOP. (Tr. 580-81)

Plaintiff reported that she could not afford the medications during an appointment with Dr. Partap on January 5, 2012. Dr. Partap provided medication samples. On February 15, 2012, Plaintiff's sister reported that she did not see any improvement. Dr. Partap noted that Plaintiff's appearance, attitude, and affect were good. On March 15, 2012, Plaintiff reported visual and auditory hallucinations. She had delusions of someone behind her and tactile hallucinations of being touched on the shoulder. On April 17, 2012, Dr. Partap noted that Plaintiff had been taking her medications only 50% of the time until recently. Plaintiff was improved, with hallucinations down by 25%. Her appearance, attitude, and affect were good. Dr. Partap noted Plaintiff was lively. (Tr. 578-79)

6

On April 24, 2012, Dr. Partap completed an Assessment for Social Security Disability Claim. Dr. Partap described Plaintiff's psychiatric history as "[a]uditory hallucinations consisting of her name, voices telling her to hurt people and visual hallucinations of Jesus, demons and dead relatives for last 12 years. Stabbed old lady friend in 1996 and beat a coworker in 2009. Paranoid around people." (Tr. 576) Dr. Partap noted that Plaintiff reported that treatment relieved 25% of hallucinations and delusions. Dr. Partap recommended that Plaintiff continue Zyprexa, Benztropine, and Alprazolam and continue supportive psychotherapy. (Tr. 576)

In a Mental Residual Functional Capacity Assessment completed on that same date, Dr. Partrap assessed marked abilities to understand, remember, and carry out detailed instructions and procedures; maintain adequate attention, concentration, and focus on work duties throughout a complete work day; complete a normal work week without interruptions from psychologically based symptoms; interact appropriately with the general public or customers; work in coordination with, or in close proximity to others; and accept instructions and respond appropriately to criticism from supervisors or co-workers. (Tr. 577)

On July 24, 2012, Plaintiff reported no substantial change in symptoms. She continued to report auditory and visual hallucinations. While she kept busy during the day, she could not ignore the hallucinations. However, she reported feeling in better control of herself. Dr. Partap noted Plaintiff was cheerful, with appearance and affect unremarkable. On October 1, 2013, Plaintiff stated that she could not afford medications and never filled her prescriptions. Dr. Partap counseled Plaintiff and her husband about Plaintiff's diagnosis and treatment. On October 29, 2013, Plaintiff reported that she was calmer and less temperamental; however she

denied any relief in voices. She did not like Temazepam. Dr. Partap counseled Plaintiff and her husband with regard to handling the voices and Plaintiff's anger. (Tr. 645)

Plaintiff reported some relief in paranoia and hallucinations during a December 19, 2013 appointment with Dr. Partap. She did not feel offended by rude behavior in the office as before. She reported that the voices in her head woke her up and scared her. Dr. Partap noted that Plaintiff was well-groomed and cooperative. Her mood was normal, and her affect was appropriate. She demonstrated paranoid delusions and auditory hallucinations. Plaintiff's judgment was mildly impaired, and her insight was limited. (Tr. 645-46)

On February 21, 2014, Plaintiff stated that she had three altercations with McDonald's customers through the prior week. She had been working there for six months. Plaintiff ran out of medication and reported seeing dark images which scared her. She heard noises and command hallucinations, and she believed people were out to get her. Dr. Partap increased Plaintiff's Risperidone and continued Benztropine and Zolpidem. Plaintiff told Dr. Partap that she quit her job at McDonald's during an appointment on March 21, 2014. Plaintiff reported improved sleep. She spent the day performing chores in her house. The voices told her to do normal things, which she wanted to postpone. Plaintiff reported some relief in the dark shadows. Dr. Partap noted that Plaintiff was well-groomed and cooperative. Her mood was normal, and her affect was appropriate. Plaintiff's thought process was logical and goal directed. She demonstrated paranoid delusions, auditory hallucinations, and visual hallucinations. Plaintiff's judgment was mildly impaired, and her insight was limited. Plaintiff had no suicidal, homicidal, or violent thoughts. Her reasoning was normal, and her concentration was intact. (Tr. 667-68)

8

Dr. Partap completed an updated Assessment for Social Security Disability Claims on May 1, 2014. Dr. Partap diagnosed schizophrenia and noted that Plaintiff took Risperidone, Benztropine, and Zolpidem. Dr. Partap opined that Plaintiff was severely impaired for an indefinite period. In addition, Dr. Partap assessed marked limitations in Plaintiff's ability to maintain a work schedule and be consistently punctual; make appropriate simple work related decisions; interact appropriately with the general public or customers; respond appropriately to routine work related stressors; demonstrate reliability in a work setting; and sustain extended periods of employment (greater than 6 months) without decompensation from periodic exacerbation of psychiatric symptoms. (Tr. 665-66)

Consultative opinions included a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment by Marsha Toll, PSYD on June 1, 2011. Dr. Toll assessed affective disorders, personality disorders, and substance addiction disorders. She opined that Plaintiff had marked limitations in maintaining social functioning. Additionally, Dr. Toll assessed either no limitations or moderate limitations to understanding and memory; sustained concentration and persistence; social interaction; and adaptation. (Tr. 530-44)

L. Lynn Mades, Ph.D., examined Plaintiff on May 10, 2011 on behalf of Disability Determinations. Dr. Mades noted that Plaintiff's mood was euthymic, at times agitated. Her affect was slightly labile and generally appropriate. Plaintiff reported no delusions, and auditory and visual hallucinations were not present. Dr. Mades opined that Plaintiff's report of auditory hallucinations did not appear credible. Overall, Dr. Mades noted no evidence of thought disturbance. Dr. Mades diagnosed mood disorder, NOS; polysubstance dependence, remission status unknown; personality disorder, NOS with antisocial and narcissistic traits; and a Global Assessment Functioning ("GAF") of 75-80. Plaintiff's prognosis was fair. (Tr. 519-24)

## IV. The ALJ's Determination

In the decision dated April 17, 2014, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015. Plaintiff had not engaged in substantial gainful activity since March 15, 2010, her alleged onset date. The ALJ determined that Plaintiff had the severe impairments of cervical degenerative disc disease, mood disorder not otherwise specified, personality disorder not otherwise specified, and polysubstance addiction disorder in reported remission. However, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether Plaintiff's mental impairments satisfied the "paragraph B" and "paragraph C" criteria and determined that the evidence failed to establish either. (Tr. 29-35)

After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work except Plaintiff could stand and/or walk six hours in an eight-hour work day; sit for six hours in an eight-hour work day; lift and/or carry twenty pounds occasionally and ten pounds frequently; avoid climbing ropes, ladders, and scaffolds; push and pull frequently with the upper extremities; avoid hazards of heights; understand, remember, and carry out at least simple instructions and non-detailed tasks; and not perform work which includes more than infrequent handling of customer complaints. The ALJ found that Plaintiff was unable to perform any of her past relevant work. However, the ALJ considered Plaintiff's closely approaching advanced age, education, work experience, and RFC and determined that Plaintiff could perform the jobs of Marker, Assembler of Small Products, and Motel Cleaner. These jobs existed in significant numbers in the national economy. Thus,

the ALJ concluded that Plaintiff had not been under a disability from March 15, 2010 through the date of the decision. (Tr. 35-47)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that she has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the

11

evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.* at 1354.

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[3] factors and whether the evidence so contradicts

---

[3]     The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quoting *Moore v.*

12

plaintiff's subjective complaints that the ALJ could discount the testimony as not credible.
*Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in
the record and a lack of supporting medical evidence support the ALJ's decision, the Court will
not reverse the decision simply because some evidence may support the opposite conclusion.
*Marciniak*, 49 F.3d at 1354.

## VI. Discussion

In her Brief in Support of the Complaint, Plaintiff raises three arguments. First, Plaintiff
asserts that the ALJ's decision is contrary to the weight of the evidence currently of record.
Next, Plaintiff contends that the ALJ failed to properly evaluate opinion evidence. Finally,
Plaintiff argues that the ALJ failed to properly consider the issue of failure to follow prescribed
treatment. In response, Defendant contends that the new evidence submitted to the Appeals
Council does not provide a basis for changing the ALJ's decision. Further, Defendant argues
that the ALJ properly considered all of the evidence in the record as a whole, including medical
opinion evidence, to determine her RFC. Defendant also asserts that the ALJ properly
considered Plaintiff's non-compliance as a credibility factor. Last, Defendant maintains that the
ALJ properly determined that Plaintiff could perform other work.

## A. New Evidence

Plaintiff obtained evidence from Dr. Partap subsequent to the ALJ's decision. The
evidence consists of treatment records and a medical source statement dated December 19, 2013
to May 1, 2014. "The regulations provide that the Appeals Council must evaluate the entire
record, including any new and material evidence that relates to the period before the ALJ's
decision." *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000) (citing 20 C.F.R. §

_____

*Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th
Cir. 1984)).

404.970(b)). Evidence is "new" where it is "'more than merely cumulative of other evidence in the record.'" *Lamp v. Astrue*, 531 F.3d 629, 632 (8th Cir. 2008) (quoting *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000)). "And evidence is material if it is 'relevant to claimant's condition for the time period for which benefits were denied.'" *Id.* (quoting *Bergmann*, 207 F.3d at 1069). Newly submitted evidence becomes part of the record, even though the evidence was not included in the record before the ALJ. *Cunningham*, 222 F.3d at 500.

"Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007) (citations omitted). A finding by the Appeals Council "that additional evidence 'did not provide a basis for changing the ALJ's decision'" is interpreted as a finding that the evidence was not material. *Al Hajami v. Colvin*, No. 4:12CV2252 TIA, 2014 WL 4467842, at *19 (E.D. Mo. Sept. 9, 2014) (quoting *Aulston v. Astrue*, 277 Fed. App'x 663, 664 (8th Cir. 2008)). Where a plaintiff requests remand to consider new evidence, the plaintiff must demonstrate "'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hepp v. Astrue*, 511 F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)). Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation. *Id.*

Here, the Appeals Council considered additional evidence, including treatment records from Dr. Partap, and concluded that the records did not provide a basis for changing the ALJ's decision. (Tr. 2, 5) While these medical records are now part of the administrative record,

Plaintiff must show that the evidence is new and material, and must also show good cause for failing to incorporate the evidence into the record before the ALJ. *Hepp*, 511 F.3d at 808.

The Court finds that Plaintiff has failed to demonstrate that the evidence is material or that there is good cause for failing to obtain the evidence prior to the close of the administrative record. At the end of the February 10, 2014 hearing, the ALJ noted that the record would remain open to allow Plaintiff to submit additional medical evidence. (Tr. 144) Other than the updated medical source statement of May 1, 2014, the treatment records from Dr. Partap were from dates prior to the ALJ's decision. Plaintiff provides no explanation as to why she did not obtain and submit the treatment records earlier. *See Hepp*, 511 F.3d at 808 (finding plaintiff did not establish good cause where he provided no explanation for failing to obtain the information before the record closed).

Further, the Court finds the new evidence is not material. "To be considered material, the new evidence must be 'non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied.'" *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) (quoting *Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993)). Further, "there must be a reasonable likelihood that [the new evidence] would have changed the [ALJ's] determination." *Woolf*, 3 F.3d at 1215. The updated treatment notes and medical source statement merely reiterate previous notes and opinions. Indeed, Plaintiff acknowledges that the evidence is consistent with Dr. Partap's prior treatment notes and 2012 medical source statement. Specific to the updated medical source statement, Dr. Partap opined that Plaintiff was severely impaired for an indefinite period. (Tr. 665) Dr. Partap provides no explanation for this opinion, and the Court notes that the ALJ determined Plaintiff's mental impairments to be severe. (Tr. 32) The Court finds that Dr. Partap's 2014 assessment does not provide a basis for changing the

outcome of the decision. Further, while the 2104 Mental Residual Functional Capacity Assessment contained different specific limitations than the 2012 assessment, both assessments indicate moderate and marked limitations in areas of work performance, social interactions, and adaptation. The Court thus finds that the submitted evidence is duplicative and cumulative of other evidence in the record, and therefore remand is not warranted. *Al Hajami*, 2014 WL 4467842, at \*20.

Finally, as will be developed below, the Court finds that the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence. *Davidson*, 501 F.3d at 990 ("Where, as here, the Appeals Council considers new evidence but denies review, we must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence."). Therefore, Plaintiff's request for remand for further evaluation of new evidence will be denied.

## B. Opinion Evidence

Plaintiff argues that the ALJ failed to properly evaluate the opinion evidence from Dr. Partap, Plaintiff's treating psychiatrist. Defendant contends that the ALJ properly gave Dr. Partap's opinion little weight overall and adequately accounted for Plaintiff's mental limitations that were supported by the record in determining her RFC.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). *see also* SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical

16

and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. *Goetz v. Barnhart*, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." *Swarnes v. Astrue*, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that the ALJ properly discounted a treating physician's opinion where it consisted of checklist forms, cited no medical evidence, and provided little to no elaboration).

Here, the record shows that the ALJ thoroughly considered the medical records and gave proper weight to the medical opinion evidence. Specifically with regard to Dr. Partap, the ALJ gave the opinion little weight because it was inconsistent with treatment notes and with Plaintiff's activities, including working part-time. While Dr. Partap found marked limitations in several areas of functioning, his treatment records often reflected that Plaintiff's appearance, attitude, and affect were good. (Tr. 578-81) On April 17, 2012, Dr. Partap noted improvement in Plaintiff's hallucinations after she began taking her medication regularly. Plaintiff was sleeping well and was lively. (Tr. 578) On July 24, 2012, Plaintiff reported being in better control of herself, and Dr. Partap noted Plaintiff was cheerful with dress, appearance, and affect unremarkable. (Tr. 647) Additionally, Plaintiff reported some relief in symptoms on December 19, 2013. Plaintiff's mental status exam was essentially normal. (Tr. 16-17) The ALJ acknowledged that these treatment records were inconsistent with the marked restrictions set forth in Dr. Partap's opinion. (Tr. 43-44)

17

"It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) (citations omitted). Additionally, Dr. Partap appeared to base his opinions on Plaintiff's subjective reports, as the objective data and treatment notes were inconsistent with the marked limitations in several areas of function. *See Teague v. Astrue*, 638 F.3d 611, 615-16 (8th Cir. 2011) (finding the ALJ properly discounted the consulting psychologist's opinion where it was based on plaintiff's subjective complaints and not objective findings and was inconsistent with the psychologist's own notes). Dr. Partap also failed to provide any explanation for the marked limitations that he assessed. "[A] conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little to no elaboration.'" *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (quoting *Wildman*, 596 F.3d at 964). While Dr. Partap directed the reader to refer to the medical treatment records and progress notes, the ALJ properly noted that the treatment records were inconsistent with the extreme limitations contained in the Mental RFC Assessment. (Tr. 44-45, 576, 665)

In addition, as noted by the ALJ, Plaintiff showed improvement when she was compliant with her medications. (Tr. 42-43, 45, 578-81, 667-70) Plaintiff was calmer and less temperamental, and was not offended by rude behavior in the office as before. (Tr. 645) An impairment that can be controlled by medication cannot be considered disabling. *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010) (citation omitted). Further, in October 2013, having returned to Dr. Partap after over a year, Plaintiff reported that she never filled prescriptions given on three dates in 2011. (Tr. 645) In April 2012, Plaintiff reported only taking her medication for 50% of the time. (Tr. 578) Failure to follow prescribed medical treatment can constitute evidence that is inconsistent with a treating physician's opinion. *Bernard v. Colvin*, 774 F.3d

18

482, 487-88 (8th Cir. 2014) (finding that giving controlling weight to the opinions of plaintiff's treating psychiatrist was unjustified where the doctor did not have the opportunity to assess the plaintiff when he followed the prescribed treatment plan).

The record also shows that Plaintiff reported working 20 hours a week at a fast food job. (Tr. 645) Plaintiff testified that she worked with others and sometimes took orders from patrons. (Tr. 112) Additionally, Plaintiff was able to attend church, prepare meals, and perform some household chores. These activities, including the ability to work part-time and attend church, are inconsistent with Plaintiff's claims of disabling impairments. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) (finding that the ALJ was not unreasonable in noting that the plaintiff's part-time work, cleaning house, and attending church were inconsistent with her claim of disabling pain); *March v. Astrue*, No. 4:11CV1334 LMB, 2012 WL 4412868, at *14 (E.D. Mo. Sept. 25, 2012 ("The ability to work on a part-time basis during the time in which a claimant alleges he is disabled is inconsistent with allegations of disability, and may demonstrate an ability to perform substantial gainful activity."). Based on the inconsistencies in the record between Dr. Partap's opinions and his treatment records and Plaintiff's testimony, the Court finds that the ALJ correctly found that Dr. Partap's assessment of marked limitations was unsupported by the evidence as a whole and properly gave his opinion little weight. *See Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011) ("Upon reviewing the entire record, we conclude that there is substantial evidence to support the ALJ's finding that certain opinions in the Medical Source Statement are inconsistent with [the treating physician's] own treatment notes and other relevant evidence.").

Finally, contrary to Plaintiff's argument that the ALJ failed to properly assess the opinion evidence in the record in determining Plaintiff's RFC, the Court finds that the ALJ's RFC

19

assessment is supported by medical evidence contained in the record as a whole. The ALJ need not rely entirely on a particular doctor's opinion or choose between opinions. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011). Here, the ALJ properly performed an exhaustive analysis of the medical records and noted the inconsistencies in the record between the treating source's opinions and other substantial evidence. *Id.* at 926. Further, the ALJ properly assessed and discredited Plaintiff's allegations of a disabling mental impairment. Thus, the Court finds that reversal is not warranted.

## C. Failure to Follow Prescribed Treatment

Last, Plaintiff argues that the ALJ failed to consider the criteria necessary for a finding of failure to follow prescribed treatment. While Plaintiff relies on SSR 82-59 in support of her argument, that regulation "only applies to claimants who would otherwise be disabled within the meaning of the Act; it does not restrict the use of evidence of noncompliance for the disability hearing." *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001). Here, the ALJ properly analyzed evidence of Plaintiff's non-compliance with treatment as one factor in determining Plaintiff's credibility. *Id.* "It is for the ALJ in the first instance to determine a claimant's real motivation for failing to follow prescribed treatment or seek medical attention, . . . and the fact that [the claimant] is under financial strain is not determinative[.]" *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (internal quotations and citations omitted). Thus, the Court concludes that substantial evidence based on the record as a whole supports the ALJ's determination that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social

security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum

and Order.

Dated this 22nd day of March, 2017.

Ronnie L. White

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**